987 So.2d 339 (2008)
James Madison WOODS, Plaintiff-Appellant
v.
Janis Lynn Thompson WOODS, Defendant-Appellee.
No. 43,182-CA.
Court of Appeal of Louisiana, Second Circuit.
June 11, 2008.
Rehearing Denied August 7, 2008.
*340 James Madison Woods, In Proper Person.
Franklin H. Spruiell, Jr., for Appellee.
Before BROWN, WILLIAMS and STEWART, JJ.
WILLIAMS, J.
The defendant in rule, James Madison Woods ("Woods"), appeals the trial court's judgment which granted sanctions and attorney fees in favor of his former spouse, Janis Thompson Woods ("Janis"). The court concluded that a petition for domestic abuse protection filed by Woods in October 2000 violated LSA-C.C.P. art. 863. The court ordered Woods to pay the expenses Janis incurred as a result of the proceedings. For the following reasons, we affirm the trial court's ruling.

FACTS
Woods and Janis were married September 27, 1986. Their daughter, E.A.W., was born on January 11, 1996. On March 28, 2000, Woods, an attorney licensed to practice law in the state of Louisiana, filed a petition for divorce and requested joint custody of the child. On April 7, 2000, Janis answered the petition and filed a reconventional demand for divorce, seeking, inter alia, sole custody of E.A.W. Janis alleged that Woods had committed "acts of emotional and physical abuse directed toward her as well as being guilty of abusing prescription drugs and drinking alcohol in combination with such drugs resulting in erratic and dangerous behavior, sometimes in the presence of the minor child. . . ." Janis also alleged that after she and Woods separated, she and the *341 child moved to New York, New York. She and E.A.W. returned to Shreveport to visit Woods on April 1, 2000 and Woods refused to return the child to Janis and refused to disclose her whereabouts. Janis sought an ex parte provisional custody order, a temporary restraining order and a protective order to prohibit Woods "from abusing, harassing or interfering with . . . [her]."
The trial court ordered shared custody of E.A.W. and prohibited the child from being removed from the jurisdiction of the court. The court also ordered Woods to show cause why the temporary restraining order and protective order should not be granted. A hearing was scheduled for May 9, 2000. However, on May 8, 2000, the parties filed a joint motion to reset the rule, which the court granted. There is no indication from a review of the record that the hearing was ever held. A judgment of divorce was signed on April 5, 2001.
On October 25, 2000, Woods filed a petition for domestic abuse protection on behalf of E.A.W., alleging, inter alia, physical abuse of E.A.W. by Janis. Woods also alleged that Janis suffered from "severe premenstrual rages during which time she becomes dangerous, irrational, and out of control." He specifically alleged that Janis "beat the minor child during her October premenstrual rage" and the "physical and emotional abuse of the minor child was not limited to the periods of her premenstrual rage." Woods further alleged that on October 11, 2000, he discovered "extensive bruising" on E.A.W.'s left hip, lower back and upper right hip, as well as "substantial red welting" on her left hip. He took the child to a scheduled therapy session with Laura McFerrin, the board-certified social worker who had been providing therapy for E.A.W. since April 2000.[1] He described the bruises to McFerrin and expressed his concern that the bruises may have been caused by physical abuse. Woods alleged that during the therapy session, E.A.W. informed McFerrin that Janis had spanked her with a "fly swatter" and caused the bruises. Pictures of the bruises and a 16-page report from McFerrin were attached to the petition. In the report, McFerrin stated, "Based upon the severity of the bruises and [E.A.W.'s] report of their origin, I concluded that the events [E.A.W.] reported to me represented physical abuse of a minor child."[2] Also attached to the petition was a "Suspected Child Abuse & Neglect  Treatment Record" from Louisiana State University Health Sciences Center, where Woods had taken E.A.W. to been examined on October 12, 2000. Bruises on the child's left thigh and buttocks were documented.
On October 26, 2000, the trial court concluded that the allegations contained in the petition "constitute an immediate and present danger of abuse, and that [Woods] has good and reasonable grounds to fear [for] the safety of the minor child E.A.W.. . . ." The court issued an ex parte order, ordering Janis "not to abuse, harass, stalk, follow, or threaten the minor child, E.A.W., in any manner whatsoever." Janis was also ordered not to contact E.A.W. "personally, electronically, by phone, in writing, or through a third party . . . and to "stay away from [Woods'] place of employment. . . residence . . . and . . . Southfield School while the minor child is in class therein." The order further granted *342 temporary custody of E.A.W. to Woods, with Janis having supervised visitation.[3] On November 6, 2000, another order was issued, allowing Janis to attend school programs at E.A.W.'s school and allowing her to contact E.A.W. by telephone, subject to the conversations being monitored by Woods. Janis was also allowed to send written communications to E.A.W. and to have supervised visitation on Thanksgiving Day and Christmas Day.
Following multiple delays, a custody hearing commenced on July 26, 2004.[4] At the close of the hearing, the parties requested that they be allowed to attend mediation prior to the court issuing a ruling. The mediation process ultimately failed and the matter resumed on April 6, 2005 with additional testimony and evidence being submitted.
During the trial, Janis adamantly denied ever spanking or abusing E.A.W. She stated that she has never believed in spanking because she did not endure spanking as a child. Janis also testified that she believed E.A.W.'s sessions with McFerrin were detrimental, and she implied that McFerrin was instrumental in assisting Woods in his attempts to protract the custody dispute.
Three of the deputies who supervised the visitations between Janis and E.A.W. testified that Janis was very attentive, caring and loving toward the child. They also testified that E.A.W. was always happy to see Janis and was sad when the visits ended. Each deputy also stated that they did not see any signs of physical, emotional or mental abuse by Janis and did not feel the need for supervised visitation.
Clare Coburn, the preschool director at Southfield School, also testified during the hearing. She testified that she had never seen signs of child abuse in E.A.W., nor did she suspect that E.A.W. was a victim of child abuse. She also testified that she was never concerned for E.A.W.'s safety with Janis and described E.A.W. as a "very bright, very verbal, very dramatic, happy, friendly child." Ms. Coburn testified that after Woods obtained custody, the child's demeanor changed and she "cried easily," became "very manipulative" and was often "very listless at school and would fall asleep at inappropriate times." She also testified that E.A.W. was frequently tardy and frequently absent from school following the change in custody and she became concerned about the child's physical condition and the condition of her clothing.[5] When shown a photograph of what appeared to be a bruise on E.A.W.'s leg, Ms. Coburn stated that she was not concerned about the bruise because it appeared to be typical for a child of E.A.W.'s age to incur bruises.
Dr. Lynn Holladay, E.A.W.'s pediatrician, was accepted by the court as an expert in pediatrics. Dr. Holladay testified that E.A.W. had been her patient since birth and she had never seen signs of physical abuse or had any suspicions of child abuse. She further testified that she *343 had never had any concerns about Janis and she felt that E.A.W. was a well-adjusted child with "good parents." When shown the pictures of E.A.W.'s bruises, Dr. Holladay stated:
I think this could be child abuse, but I think this could also be secondary to normal slips and falls that children have. I don't  I just see bruising on one side here. So, if I saw that, I might would be suspicious that that was secondary to a fall. I don't see a hand imprint like you can see with severe spanking or a belt streak that you can see. So, I guess my response is I think that could be child abuse but it might not be.
Emma Perry, the Woods' housekeeper since 1989, testified that she took care of E.A.W. from the time the child was an infant until Woods obtained custody in October 2000. Ms. Perry testified that she never saw Janis spank E.A.W. or physically, verbally or emotionally abuse her. She stated that Janis disciplined E.A.W. by talking to her, placing her in "time-out" or sending her to her room. Ms. Perry stated that she was present when the worker from OCS examined E.A.W., and she did not observe any bruises on the child's buttocks. Ms. Perry stated that the discoloration on E.A.W.'s buttocks depicted in photographs was the result of a persistent rash that the child had suffered from since she was a baby. She also testified that she had seen the bruises on E.A.W.'s legs and had asked the child about them. Ms. Perry testified that E.A.W. told her that she bruised her legs when she fell down the stairs at the home of Woods' girlfriend.
Dr. Bruce McCormick, an expert in psychology and child psychology, was appointed by the court to evaluate Woods and Janis. Dr. McCormick testified that he was not convinced any abuse had occurred. He further stated that based on his evaluation, Janis was not unfit to parent E.A.W. He opined that to award Woods sole custody, and to award Janis supervised visitation, was "grossly inappropriate." He opined that the supervised visitation by the mother was "hypothetically worse than corporal punishment."[6]
McFerrin also testified during the custody hearing. She testified that initially, she observed a "mutual respect" between Janis and Woods. However, in June 2000, the couple met with her to discuss custody and visitation issues. She stated tension arose when Janis expressed concern for E.A.W.'s safety, stating that Woods often mixed alcohol and prescription medication, i.e., pain medication, antidepressants and anti-anxiety medication. McFerrin also stated that Janis expressed concern about E.A.W. sleeping in the bed with Woods. She also testified with regard to the session on October 12, 2000, when Woods informed her that he had noticed bruises on E.A.W. McFerrin testified that Woods was "confused about the origin of the bruises," but he suspected that they were caused by corporal punishment. She stated that she questioned E.A.W. about the bruises and the child informed her that "her mother spanked her on the bottom with a fly swatter and that this had occurred on at least two or three occasions." McFerrin further testified that she met with Janis and E.A.W. on October 13, 2000. She stated that at first, E.A.W. reiterated that *344 Janis had spanked her with a fly swatter. However, later during the same session, E.A.W. stated that she received the bruises during a fall, and she had dreamed that her mother had spanked her.
During cross-examination, McFerrin admitted that she had written eight unsolicited letters to the trial court over a three-and-a-half-year period. When the Court questioned McFerrin with regard to why she continued to send reports to the court, she testified that she was a "court-appointed expert" in the case. However, there is no evidence in the record to support McFerrin's claim. The record reveals that the court appointed Dr. Lee Stevens as an expert in psychiatry, and as stated above, Dr. McCormick, as an expert in psychology and child psychology.[7]
Dr. Greg Brown, E.A.W.'s psychiatrist, was accepted by the court as an expert in psychiatry, including adolescent psychiatry, adult psychiatry and child psychiatry. Dr. Brown testified that he began treating E.A.W. June 11, 2001 after receiving a referral from McFerrin. He stated that E.A.W. had been experiencing anxiety, difficulty sleeping and nightmares. There were also reports that the child had been hitting herself. Dr. Brown diagnosed her with depression and post-traumatic stress disorder and prescribed Zoloft, an anti-depressant. He recommended continued therapy with McFerrin. He later prescribed Risperdal, a medication commonly used to treat schizophrenia. Dr. Brown testified that he believed that E.A.W. had been spanked by her mother. During cross-examination, Dr. Brown was shown a videotaped exchange between McFerrin and E.A.W. which occurred six days after Woods obtained custody. During the exchange, E.A.W. told McFerrin that she did not know how she obtained the bruises. E.A.W. stated:
My daddy said that my mom. . . . Um, my dad really said that my mom did it with a fly swatter. . . . And I tried to tell him that, that she really didn't, but he would just not listen. He wouldn't . . . Um, so my daddy said that my mom really spanked me with a fly swatter and my dad really thinks my mom hit me with a fly swatter like real bad, so I just think that's all I'm going to say.
After viewing the videotape, Dr. Brown admitted that he did not know about the tape's existence when he began treating E.A.W. He admitted that it was possible that E.A.W. had been coached to make the allegations with regard to the spanking, but he did not believe that any such coaching had taken place.
The testimony presented at trial also revealed that because of Woods' actions, those who were willing to supervise Janis' visitation free of charge were no longer willing to be supervisors. Janis then had to hire Caddo Parish sheriff's deputies to supervise the visitations at a rate of $80 per visit.[8] Although there were times when Woods failed or refused to bring E.A.W. to the scheduled visitations, Janis had to pay the fee regardless of whether the scheduled visit took place.
At the close of the trial on July 30, 2004, the parties requested that they be allowed to attend mediation prior to the court issuing *345 a ruling. The mediation process ultimately failed.
On April 6, 2005, the hearing resumed and additional testimony and evidence was submitted.[9] The trial court questioned E.A.W. in chambers and the child's testimony was sealed. Woods also testified during the trial. Much of his testimony centered around allegations of his abuse of alcohol and prescription medication and the alleged exposure of E.A.W. to pornographic material.[10]
Cheryl Sweeney, E.A.W.'s first-grade teacher, also testified. She stated that she had observed the interaction between Woods and E.A.W. and she found Woods to be a "loving and concerned parent." She stated that E.A.W. was generally "very upbeat," but she noticed emotional distress when E.A.W. "knew court times were coming up."
Mignonne Owens, E.A.W.'s third-grade teacher, described E.A.W. as an "extremely intelligent child," stating that she is "more advanced than the usual children her age." Owens stated that Woods is a very active participant in E.A.W.'s school activities and she did not feel that he had endangered the child in any way. She also testified that Janis had also participated in a number of school events and that she had no concerns about Janis as a parent. However, she stated that when the visitation schedule initially changed, with Woods and Janis alternating weeks with E.A.W., the child "was upset and confused, a little more emotional that week."
On April 28, 2005, the trial court rendered judgment, awarding joint custody to Woods and Janis and naming Janis the domiciliary parent.[11] The court specifically found that "the evidence did not support the allegations made by James Woods that Janis Woods spanked and/or abused the minor child." The court stated:
The only witnesses Mr. Woods presented in an attempt to prove that Ms. Woods spanked and otherwise abused their minor daughter was Laura McFerrin and Dr. Greg Brown. The testimony of each of these witnesses was based, in large part, on information provided to them by Mr. Woods. These witnesses did little to nothing to independently verify Mr. Woods' allegations.
As the finder of fact, this Court specifically notes for the record that it found much of the testimony of Laura McFerrin and Dr. Greg Brown to be incredible and not worthy of belief.
* * *
The court also specifically found that it was not in E.A.W.'s "best interest to continue treatment and counseling by either Laura McFerrin and/or Dr. Greg Brown." The court ordered the child to be examined by Dr. Holladay to determine the appropriate course of treatment, stating, "It is this Court's desire that [E.A.W.] *346 discontinue the use of Zoloft and Risperdal and any other psychotropic and/or mind altering drugs at the earliest medically appropriate time."
On September 8, 2005, Woods filed a motion and order for devolutive appeal. This court dismissed the appeal as untimely. Woods v. Woods, 41,327 (La.App. 2d Cir.4/25/06) (unpublished).
On August 31, 2005, Janis filed a rule for sanctions and attorney fees. Following a hearing, the trial court found that Woods violated LSA-C.C.P. art. 863. The court found that Janis had proven that she had incurred the following expenses:
Attorney fees to Sockrider, Bolin and Anglin in the amount of $39,777.24, plus judicial interest from September 25, 2002.
All costs of the proceeding associated with Sockrider, Bolin and Anglin law firm's collection suit against Janis;
Attorney fees to Frank H. Spruiell, Jr. in the amount of $6,176 and court costs of $401.71, plus judicial interest from August 31, 2005 until paid;
Supervised visitation fees in the amount of $9,399.15, plus judicial interest from August 31, 2005 until paid.
On February 12, 2007, Janis filed a motion for new trial, seeking an additional award of attorney fees in the amount of $18,525.21. The trial court granted the motion and amended the judgment.[12] Woods appeals.

DISCUSSION
Woods contends the trial court erred concluding that he violated the provisions of LSA-C.C.P. art. 863. Woods argues that the evidence supported the allegations contained in his petition for protective order, and, therefore, sanctions should not have been imposed.
The public policy against the filing of frivolous suits is reflected by LSA-C.C.P. art. 863, which provides, in pertinent part:
A. Every pleading of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading and state his address.
B. Pleadings need not be verified or accompanied by affidavit or certificate, except as otherwise provided by law, but the signature of an attorney or party shall constitute a certification by him that he has read the pleading; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact; that it is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
* * *
D. If, upon motion of any party or upon its own motion, the court determines that a certification has been made in violation of the provisions of this Article, the court shall impose upon the person who made the certification or the represented party, or both, an appropriate sanction which may include an order to pay to the other party or parties *347 the amount of the reasonable expenses incurred because of the filing of the pleading, including a reasonable attorney's fee.

E. A sanction authorized in Paragraph D shall be imposed only after a hearing at which any party or his counsel may present any evidence or argument relevant to the issue of imposition of the sanction.
* * *
(Emphasis added).
The obligation imposed upon litigants and their counsel who sign a pleading is to make an objectively reasonable inquiry into the facts and law; subjective good faith will not satisfy the duty of reasonable inquiry. Graves v. Fields, 35,411 (La.App. 2d Cir.12/19/01), 803 So.2d 392; Diesel Driving Academy, Inc. v. Ferrier, 563 So.2d 898 (La.App. 2d Cir.1990). LSA-C.C.P. art. 863 is intended only for exceptional circumstances and is not to be used simply because parties disagree as to the correct resolution of a legal matter. Caldwell v. Griggs, 40,838 (La.App. 2d Cir.3/8/06), 924 So.2d 464, citing Green v. Wal-Mart Store No. 1163, 96-1124 (La. App. 4th Cir.10/17/96), 684 So.2d 966. The slightest justification for the exercise of a legal right precludes sanctions. Only when the evidence is clear that there is no justification for the legal right exercised should sanctions be considered. Any lesser standard would serve to seriously impair the rights of the party as a litigant. Caldwell, supra, citing Green, supra; Fairchild v. Fairchild, 580 So.2d 513 (La. App. 4th Cir.1991).
The trial court has discretion to sanction under LSA-C.C.P. art. 863. McKoin v. Harper, 37,984 (La.App. 2d Cir.12/10/03), 862 So.2d 410; Unkel v. Unkel, 29,728 (La.App. 2d Cir.8/20/97), 699 So.2d 472. Appellate review of the decision to impose sanctions is under the manifest error/clearly wrong standard of review. Baker v. Baker, 42,182 (La.App. 2d Cir.6/20/07), 960 So.2d 1264; Haulcy v. Saint Gobain Containers, 39,405 (La.App. 2d Cir.3/9/05), 895 So.2d 803.
In the instant case, the court imposed sanctions, concluding that Woods was aware that the petition contained false allegations and that the pleadings "were not well grounded in fact or law, and [he] failed to present any competent evidence at trial in support of the allegations made by him in the petition filed on October 25, 2000." (Emphasis in original). The court further found that the allegations were made "for improper purposes, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." The court stated:
[M]r. Woods used his education and experience as an attorney licensed to practice law in Louisiana, to essentially wage a war on his wife to punish her for an affair she had while they were living in New York City. The "Rambo litigation" tactics employed by Mr. Woods deprived Ms. Woods of any meaningful relationship with their young daughter for approximately four years. Further, that Mr. Woods used this litigation and the power of the court to subject Ms. Woods to needless public humiliation, torment, emotional stress and economic ruing. However, more importantly, and much more reprehensible, is the diabolical course of action that Mr. Woods took during this litigation which deprived the minor child of her mother at a time in her life when she was very much in need of a mother's love, nurturing and guidance.
The trial court made it quite clear that it did not believe the testimony of McFerrin and Dr. Brown, stating that their testimony was "incredible and not worthy of belief." *348 During the course of this prolonged litigation, the trial court was in the best position to observe the proceedings and regard the tenor of the same. At best, the testimony of the "experts" merely served to convince the trial court that Woods had manipulated the experts and had conspired with them in this matter. From simply reading the cold record, it is apparent that the trial court found Woods' petition for protective order to be unwarranted and "interposed for . . . improper purpose, such as to harass . . ., as prohibited by LSA-C.C.P. art. 863.
Based on our review of the entire record, we find no manifest error in the trial court's conclusion that sanctions and/or orders of contempt were warranted in this case. We find that a reasonable factual basis exists in the record to support the decision of the trial court, and it will not be disturbed on appeal.
We also reject Woods' argument that the trial court violated LSA-C.C.P. art. 863(E) by refusing to allow him to present evidence in his defense, namely, E.A.W.'s sealed testimony from the custody trial.[13] During the custody trial, the parties agreed to allow E.A.W. to be questioned by the court outside of the presence of the attorneys. In fact, Woods submitted a list of 17 questions for the court to ask E.A.W. The parties agreed on the record that the child's testimony would be sealed and neither party would have access to the audiotape and/or transcript. Woods has not persuaded this court that there was a compelling reason for the trial court to disregard the parties' agreement. Moreover, Woods has failed to show that E.A.W.'s in camera testimony would assist him during the sanctions hearing.
We also find no merit to Woods' argument that Janis failed to mitigate her damages. There is nothing in this record which indicates that Janis failed to take every reasonable step to mitigate her damages. She was assisted by counsel until she became unable to pay, and she represented herself during the custody hearing. This argument lacks merit.

CONCLUSION
For the reasons set forth herein, we affirm the trial court's judgment. Costs of this appeal are assessed to the appellant, James Madison Woods.
AFFIRMED.
BROWN, C.J., dissents with written reasons.
BROWN, Chief Judge, dissenting.
This divorce action started acrimoniously and deteriorated to a reprehensible level. The trial judge eventually condemned the "Rambo litigation tactics employed by Mr. Woods (to deprive) Mrs. Woods of any meaningful relationship with their young daughter for approximately four years." Although I appreciate the trial court's sentiments, considering the acquiescence of Mrs. Woods' attorney in the interim order, I must disagree with the imposition of sanctions.
*349 The improper act on which sanctions were imposed was the petition for protective order filed on October 25, 2000. This questionable 25-page petition was filed and signed by Mr. Woods' attorney, Ron Miciotto. Mr. Woods signed an affidavit as to the correctness of the allegation. There was also a 16-page report by Laura McFerrin, a board certified social worker, attached to the petition. On October 26, 2000, Judge Michael Walker considered the allegations in the petition and signed an ex parte order which removed the four-year-old child from her mother's care. The judge also set a hearing to show cause why the protective order should not be granted for November 6, 2000.
At the hearing on November 6, 2000, both parties appeared with counsel. Mr. Miciotto represented Mr. Woods, and the Sockrider law firm represented Mrs. Woods. The parties agreed to an interim order, which is the action that "deprived Mrs. Woods of any meaningful relationship with (her) young daughter for approximately four years."
During the next two years the Sockrider law firm ran up a legal bill of more than $50,000 without ever obtaining a hearing to set aside the interim order. Then in October 2002, the Sockrider firm dropped Mrs. Woods as a client. In March 2003, Ron Miciotto withdrew as Mr. Woods' attorney and both parties continued pro se.
A trial was held in July 2004. At its close, the parties requested to be allowed to mediate. Mediation failed, however, and the trial continued in April 2005 (eight months later). The trial court ruled in favor of Mrs. Woods, and as a result, she hired her present attorney who filed this action seeking sanctions solely against Mr. Woods. No sanctions were sought against Mr. Woods' attorney who prepared and signed the pleading.
Considering that (1) Mrs. Woods and her attorney agreed to the interim order in 2000; (2) the same attorney represented Mrs. Woods for two more years without ever filing a rule to set aside the interim custody order; and (3) when a trial finally did commence, four years after the interim order, it was continued for eight months upon the parties' request to mediate, I do not believe sanctions under La. C.C.P. art. 863 can be applied.
BROWN, Chief Judge, dissents with written reasons.

APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, CARAWAY and MOORE, JJ.
Rehearing denied.
BROWN, C.J., would grant rehearing.
NOTES
[1] McFerrin testified that Woods and Janis sought counseling for E.A.W. because they had recently separated and were planning to divorce. According to McFerrin, the couple wanted E.A.W. to "adjust to this circumstance as smoothing [sic] as possible."
[2] On October 12, 2000, McFerrin reported the alleged abuse to the Caddo Parish Office of Community Services ("OCS").
[3] Rather than going to Janis' home to retrieve the child, Woods and a sheriff's deputy went to a Halloween event sponsored by E.A.W.'s school and took the four year-old child away from her mother in the presence of students, teachers, parents and other spectators.
[4] The case was originally assigned to Judge Michael Walker, who presided over the matter from its inception until January 2003, when he transferred to a different section of the court. In January 2003, the case was assigned to ad hoc Judge Andrew Gallagher. By the time the current trial judge was sworn in, December 2003, the case had been pending for over three years.
[5] Ms. Coburn stated that E.A.W.'s clothes were often too small and, on at least one occasion, the child wore a torn shirt to school. She also testified that E.A.W. told her teachers that she often packed her own lunch.
[6] In a report prepared by Dr. McCormick dated January 22, 2001, he stated:

[I]t is not possible to conclusively determine if and by whom E.A.W. might have been spanked. However, the findings from this evaluation strongly support the impression that abusive treatment of E.A.W. would be quite out of character for [Janis]. Whatever may have transpired at the time marks were found on the child, it is believed that there is minimal risk of physical maltreatment from her mother in the future.
[7] It is also important to note that McFerrin admitted that Janis terminated her services on October 19, 2000, but she continued to see E.A.W. pursuant to Woods' instructions. McFerrin saw E.A.W. until September 2004, when she notified Woods that she was discontinuing therapy with the child due to her belief that it was in the child's "best interest in terms of working toward a successful reunification" with Janis.
[8] Additionally, during this time, Janis was arrested and prosecuted for violating the protective order.
[9] By this time, E.A.W. was no longer being treated by either Dr. Brown or McFerrin. However, she was still taking Zoloft and Risperdal.
[10] Apparently, Woods had used E.A.W.'s computer on at least one occasion. Following his use, E.A.W. observed images of nude women on the computer. Janis also testified that Woods had a collection of pornographic magazines that were easily accessible to E.A.W.
[11] Each party was specifically prohibited from "consuming alcoholic beverages, or being under the influence of alcoholic beverages" while in the presence of E.A.W.; "ingesting any controlled dangerous substances for which he/she does not have a valid prescription;" "exposing, directly or indirectly, the minor child to any pornographic material of any nature;" and "making any derogatory comments or speaking ill of the other parent.. . ."
[12] On May 3, 2007, the trial court issued an amended judgment ordering Woods to pay $37,788.38, plus judicial interest, to Sockrider, Bolin and Anglin; $17,598.95, representing all payments made by Janis to Sockrider, Bolin Anglin & Batte; monetary damages in the amount of $9,399.15 for the supervised visitation fees; attorney fees in the amount of $6,176 and court costs of $401.71.
[13] In custody matters, when a trial judge holds an in camera interrogation of a child, it should be conducted outside the presence of the parents, but in the presence of the attorneys and a court reporter who shall record the child's testimony. Brown v. Brown, 39,060 (La.App. 2d Cir.7/21/04), 877 So.2d 1228), citing Watermeier v. Watermeier, 462 So.2d 1272 (La.App. 5th Cir.), writ denied, 464 So.2d 301 (La. 1985). The purpose of the in-chambers interview is to determine the child's preference outside the presence of the parents. Brown, supra; Osborne v. McCoy, 485 So.2d 150 (La.App. 2d Cir. 1986). Although the attorneys may be present, their questioning is limited to the determination of the child's competency. Brown, supra; Watermeier, supra.