DREW, J.
hln this action involving a reconventional and third-party demand alleging fraud as well as violations of the Louisiana Racketeering Act,[1] M. Carl Rice, William Ken-dig, and Rice & Kendig (“R & K”) appeal a judgment dismissing their motion for sanctions.
We affirm.
FACTS
Most of the background for this matter can be found in this court’s prior opinions in Skannal v. Bamburg, 44,820 (La.1/27/10), 33 So.3d 227, writ denied, 2010-0707 (La.5/28/10), 36 So.3d 254, and Skannal v. Jones Odom Davis & Politz, L.L.P., 48,016 (La.App.2d Cir.9/25/13), 124 So.3d 500, writ denied, 2013-2887 (La.2/21/14), 134 So.3d 584.

Skannal v. Bamburg

Skannal v. Bamburg involved the nullification of contracts between John C. Skan-nal (“JCS”) and Dennis and Margie Bam-burg, who were JCS’s business partners. These contracts concerned membership interests in Sligo Hills, LLC; Sligo Enterprises; and mineral deeds with assignments of leases. JCS had a daughter, *36 Elizabeth, and two sons, John Barron Skannal (“JBS”) and A.C. Skannal (“ACS”). Following JCS’s death in November of 2005, JBS became executor of JCS’s succession (“Succession”) and trustee of the JCS Trust (“Trust”).
When JCS’s children became concerned about their father’s condition and financial dealings, they brought him to attorney John Odom, Jr., in |8early 2005. Odom was practicing with attorney J. Marshall Jones, Jr. with the firm Jones Odom (“J & O”).[2]
On March 13, 2005, Jones, Odom, JCS (represented by JBS), JBS, and ACS entered into an agreement for legal services with an additional contingency fee. It was agreed that in addition to being charged an hourly fee of $200, the clients would pay, at Jones’s and Odom’s option, 33.33% of any settlement made or judgment rendered after the filing of suit, with a credit back to the clients for all fees already paid. Hourly fees charged for work on appeal would not be subject to a credit back to the clients.
Also on March 13, 2005, Jones, Odom, and Rice entered into a consultancy agreement for the suit to be filed by JCS against the Bamburgs. Rice was to assist in client relations, investigation, strategy, and such other matters as may be mutually agreeable between J & O and Rice. In return, Rice was to receive one-ninth of J & O’s earned contingency fee. JBS and ACS (“the Skannals”) ratified this agreement on February 12, 2007.
J <& O filed suit on behalf of JCS against the Bamburgs and Sligo Hills on March 14, 2005. The case was tried over 16 days in 2007, with the trial court ultimately ruling in March of 2008 that several contracts were to be set aside. The trial court later issued a supplemental opinion finding fraud as well as nullifying a right to sell agreement. On August 18, 2008, a motion to tax costs and fees was filed. After another hearing, the trial court ruled on the matter of costs and fees for attorneys and expert witnesses. RAttorney fees of $500,000 were awarded. A final judgment was rendered by the trial court on January 13, 2009.
The Skannals paid approximately $900,000 in hourly fees to J & O between March of 2005 and August of 2008. Shortly thereafter, it became difficult for the Skannals to pay the fee invoices submitted by J & O, and they stopped paying them. J & O wrote to the Skannals on September 18, 2008, to suggest an amendment to the original fee agreement that took into consideration that the Skannals had. stopped paying fees owed to J & O. On October 1, 2008, J & O and the Skannals. amended their original fee agreement because of the amounts owed by the Skannals for legal fees. Under the amendment, if J & O exercised the contingency fee option, they would no longer have a repayment obligation for the outstanding balance owed-by the Skannals as well as what would be charged for future work.
Although the Skannals acknowledged that Jones and Odom were entitled to receive one-third of what they recovered, a disagreement began around July of 2009 concerning how that one-third was to be calculated since a repayment obligation was owed to the Bamburgs by the Succession.
A suspensive appeal was granted in Skannal v. Bamburg in June of 2009. It was converted to a devolutive appeal two months later. In January of 2010, this court affirmed most of the judgment, but reversed it insofar as it nullified an exclusive right to sell agreement. The judg *37 ment was also amended to set the amount of the penalty for fraud.
|4On July 23, 2009, a fee disbursement agreement (“FDA”) was executed between J & 0, JBS, ACS, and Elizabeth Skannal.[3] The following day, Rice and the Skannals entered into an additional contingency fee agreement for legal services under which Rice would receive an additional 3% of any settlement or judgment.

Fee Dispute

On September 18, 2009, the Skannals sued to nullify the one-third contingency fee given to J & O as well as to assert a claim of legal malpractice against Jones. The Skannals were represented by the firm of Stone Pigman.[4] On July 7, 2010, Rice filed a petition of intervention against J & O and the Skannals seeking payment of the contingency fee owed to him.
On August 9, 2011, J & O appeared as a creditor and an interested party in the Succession and filed a petition to annul JCS’s 2005 testament. J & O alleged that JCS lacked testamentary capacity and could not read at the time he executed the June 2005 testament, and J & O sought the acknowledgment and probate of JCS’s 1994 will, which named Elizabeth Skannal as the sole legatee.
The trial court denied the Skannals’ motion for partial summary judgment on October 9, 2012. However, this court granted the Skannals’ supervisory writ and, on September 25, 2013, reversed the trial court and nullified the contingency fee option.
| rJReconventional and third-party demand
On February 10, 2011, attorney David Taggart, on behalf of J & O, Jones, and Odom, filed under seal a reconventional demand against JBS, ACS, the Succession, the Trust, and Rice, and a third-party demand against Rice and Kendig, jointly as members of an unincorporated enterprise known as R & K. A verification of correctness signed by Jones and Odom was attached.
Among the allegations made were that the Skannals, Rice, and R & K, who were referred to collectively as the “RICO defendants,” performed unlawful acts of racketeering activity on J & O in violation of La. R.S. 15:1353(B) and (C). They also alleged:
78.
Plaintiffs in Reconvention and Third Party Plaintiffs believe that [JBS], [ACS], Rice and Rice and Kendig (“RICO defendants”), formed an association, in fact, in which they agreed to perpetrate various unlawful acts of racketeering activity on Jones & Odom in violation of La. R.S. 15:1353(B) and (C) and for which a private cause of action is provided by La. R.S. 15:1356(E).
79.
Plaintiffs in Reconvention and Third Party Plaintiffs believe, and allege upon information and belief, that the RICO defendants associated with the Skannal Succession and the Skannal Trust, using said Skannal Succession and Skannal Trust as the enterprise to effect their unlawful racketeering activity.
80.
Specifically, the RICO defendants violated, -on numerous occasions beginning in June 2009, the provisions of La. R.S. 14:67 by knowingly accepting the payments from Jones & Odom constituting the repayment obligation of Jones & Odom under the Initial Fee Agreement, *38 as amended, and the Fee Disbursement Agreement, by false and fraudulent practices - and representations with the concealed intent, then unknown to Jones & Odom, of depriving Jones & Odom permanently thereof. In addition, the RICO defendants, or one or more of them, violated La. R.S. 14:67 by taking possession of the ^royalty payments from various companies ... under the false and fraudulent pretense and representation that said RICO defendants would pay to Jones & Odom their one-third portion thereof when in fact the RICO defendants intended to deprive Jones & Odom permanently of the amounts to which they were entitled.
81.
Further, the RICO defendants knowingly and intentionally violated the provisions of. La. R.S. 51:712'in that a) they employed devices, schemes, and artifices to defraud Jones <& Odom in connection with the offer to sell, assign and transfer to Jones & Odom securities, as defined in La. R.S. 51:702, including one-sixth of the unregistered capital stock of Sligo Enterprises, Inc., one-sixth of the membership interests in Sligo Hills, L.L.C., and fractional undivided interests in minerals and mineral rights, for and in consideration of the work and services of Jones & Odom in connection with Suit No. 116,576; and b) the RICO defendants made knowingly untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in connection with the offer to sell, assign and transfer to Jones & Odom one-sixth of the unregistered capital stock of Sligo Enterprises, Inc. for, and in consideration of, the work and services of Jones & Odom in connection with Suit No. 116,576.
-82.
Based on the factual allegations, the RICO defendants engaged in a pattern of racketeering activity by the commission of more than two (2) predicate acts of racketeering activity in connections with the operation of the enterprises and by virtue of which the enterprises acquired interests in immovable property in Louisiana and by which they conspired together to acquire immovable property in Louisiana through their enterprises and their association in connections therewith. The pattern of racketeering activity in which the RICO defendants engaged, directly or indirectly, with the enterprises injured Jones & Odom for which all RICO defendants are liable in solido for three times the actual damages sustained by Jones & Odom, plus all attorney fees and costs of investigation and litigation reasonably incurred.
In the month after the reconventional and third-party demand was filed, Taggart began communicating with Nancy Marshall, who was 17representing Rice and Kendig in this matter. Marshall asked for an extension to respond. -
On March 22, 2011, Marshall wrote a letter to Taggart in which she explained that, as per their earlier conversation: (i) Rice and Kendig did not refer the Skan-nals to Stone Pigman; (ii) Rice and Kendig became aware of Stone Pigman’s involvement only when members of Stone Pigman called them one or two days before the lawsuit was filed; (iii) Rice & Kendig did not receive any compensation for their work for this case other than reimbursement for costs expended; (iv) there was no conspiracy, but a belief by Rice and Ken-dig that the one-third interest they were entitled to should be taken after the award was reduced by the repayment obligation *39 owed to Bamburg; and (v) Rice had advised Skannal not to accept the 40% contingency fee initially proposed. Attached to the letter were affidavits from Rice, Kendig, and accounting personnel at R & K, and a copy of a R & K ledger with a note of correction from Kendig relating to $7,261 paid to the firm by JBS in July of 2009 that had been incorrectly reported as a settlement when in fact it was reimbursement for expenses.
Taggart then went to New Orleans to meet with Marshall and get her to explain the position of Rice and Kendig. He agreed that since discovery had not yet been conducted against the Skannals, he would voluntarily dismiss Rice and Kendig and pursue discovery against the Skannals.
On March 31, 2011, Marshall wrote to Taggart following their meeting. She stated that Taggart agreed to dismiss the claims against Rice, Kendig, and R & K, and delete the references to them in the reconventional |sand third-party demands. She added that she would not have to respond to any of the subpoenas or other outstanding discovery requests.
Based upon those communications, a motion was filed by Jones, Marshall, and J & O on April 4, 2011, to dismiss all claims against Rice and R & K as suggested by Marshall, but without prejudice. The motion was granted two days later.
In June of 2011, a first supplemental and amending reconventional demand was filed that named the Skannals, the Succession, and the Trust as defendants. ■
On July 26, 2011, a motion to clarify the earlier motion and order of dismissal was filed. It stated that the intent of the earlier motion was to dismiss R & K and thereby dismiss its members Rice and Kendig.. Three days later, an order was granted stating that the earlier order dismissing the third-party demand claims against Rice & Kendig without prejudice was clarified and understood to include the voluntary dismissal of Rice and Kendig as members of the unincorporated enterprise ofR&K.

Motion for sanctions

On July 11, 2011, Rice and Kendig d/b/a R & K filed a motion for sanctions against Odom, Jones, J & O, and Taggart. A hearing on the motion for sanctions was held on February 14 and May 23, 2014. The trial court found that the motion was without merit and dismissed it. Rice and Kendig appealed. A copy of the trial court’s ruling is attached as an appendix to this opinion.
^DISCUSSION

Applicable law

La. C.C.P. art. 863 regulates the signing of pleadings. It provides, in part:
B. Pleadings need not be verified or accompanied by affidavit or certificate, except as otherwise provided by law, but the signature of an attorney or party shall .constitute a certification by him that he has read the pleading, and that to. the best- of his knowledge, information, and belief formed after reasonable inquiry, he certifies all of the following:
(1) The pleading is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or' needlessly increase the cost of litigation.
(2) Each claim, defense, or other legal assertion in the pleading is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law.
.(3) Each allegation or other factual assertion in the pleading has evidentiary support or, for a specifically identified allegation or factual assertion, is likely to have evidentiary support after a rea *40 sonable opportunity for further investigation or discovery.
[[Image here]]
D. If, upon motion of any party or upon its own motion, the court determines that a certification has been made in violation of the provisions of this Article, the court shall impose upon the person who made the certification or the represented party, or both, an appropriate sanction which may include an order to pay to the other party the amount of the reasonable expenses incurred because of the filing of the pleading, including reasonable attorney fees.
E. A sanction authorized in Paragraph D shall be imposed only after a hearing at which any party or his counsel may present any evidence or argument relevant to the issue of imposition of the sanction.
F. A sanction authorized in Paragraph D shall not be imposed with respect to an original petition which is filed within sixty days of an applicable prescriptive date and then voluntarily dismissed within ninety days after its filing or on the date of a hearing on the pleading, whichever is earlier.
|10A trial court’s factual findings as a basis for awarding (or not awarding) sanctions for failure to comply with a statute requiring an attorney or litigant who signs a pleading to make objectively reasonable inquiry into facts arid law are reviewed under the manifest-error or clearly-wrong standard. Once the trial court finds a violation of art. 863 and imposes sanctions, the determination of the type and/or the amount of the sanction is reviewed on appeal utilizing the abuse of discretion standard. Walters v. Klagholz, 43,944 (La.App.2d Cir.1/14/09), 999 So.2d 1212.
Sanctions under art. 863 are to be utilized for exceptional circumstances. Woods v. Woods, 43,182 (La.App.2d Cir.6/11/08), 987 So.2d 339, writ denied, 2008-2256 (La.11/21/08), 996 So.2d 1110; Brown v. Sanders, 2006-1171 (La.App. 1st Cir.3/23/07), 960 So.2d 931. The slightest justification for the exercise of a legal right precludes sanctions. Woods, supra.
Article 863 authorizes a court to impose sanctions upon an attorney (or a represented party) who signs pleadings without making an objectively reasonable inquiry into the facts and the law. Brown v. Sanders, supra. Subjective good faith does not satisfy the duty of reasonable inquiry. Diesel Driving Academy, Inc. v. Perrier, 563 So.2d 898 (La.App. 2d Cir. 1990). Article 863 has no express “bright line” requirements for the timeliness or the extent of the investigation necessary for compliance with the article. Brown v. Sanders, supra.
Among the factors to be considered in determining whether a reasonable factual inquiry has been made are: (1) the time available to the | ^signer for investigation; (2) the extent of the attorney’s reliance on his client for the factual support for the document; (3) the feasibility of a prefiling investigation; (4) whether the signing attorney accepted the case from another member of the bar or forwarding attorney; (5) the complexity of the factual and legal issues; and (6) the extent to which development of the factual circumstances underlying the claim requires discovery. Diesel Driving Academy, supra.
Factors for determining whether reasonable legal inquiry was made include: (1) the time available to the attorney to prepare the document; (2) the plausibility of the legal view contained in the document; (3) the pro se status of a litigant; and (4) the complexity of the legal and *41 factual- issues raised. Diesel Driving Academy, supra.
The trial court should avoid using the wisdom of hindsight and should test the signer’s conduct by inquiring what was reasonable to believe at the time the pleading was filed. Sanchez v. Liberty Lloyds, 95-0956 (La.App. 1st Cir.4/4/96), 672 So.2d 268, writ denied, 96-1123 (La.6/7/96), 674 So.2d 972.
Article 863 seeks to strike a balance between the need to curtail abuse of the legal system and the need to encourage creativity and vitality in the law. Brown, supra; Lafourche Parish Council v. Breaux, 2002-1565 (La.App. 1st Cir.5/9/03), 845 So.2d 645. For an attorney, who owes professional and ethical considerations pursuant to Article 863, and at the same time has the duty of due diligence and timeliness to his clients, this |12often creates a delicate balance, warranting a case-by-case consideration of the particular facts and circumstances present in each case. Brown, supra.

Assignment of Error One: The trial judge erred, as a matter of law, in failing to apply the correct burden of proof-requiring Jones and Odom, as the pleading paHy, to first prove their compliance with La. C.C.P. art. 863.

Rice and Kendig complain that the trial court did not apply the proper “order” of proof and require Jones and Odom to first present evidence and testimony showing compliance. They argue that the court instead required them to “go first” and prove that Jones and Odom did not perform due diligence, make a reasonable inquiry, or form the required belief that their pleadings were warranted by law and had evidentiary support.
Jones and Odom counter that there was no contemporaneous objection to the order of trial, so Rice and Kendig waived their objection. Jones and Odom additionally argue that the trial court did not abuse its discretion when varying the order of testimony.
“The fact that the trial was conducted out of normal order cannot alone serve as a basis for reversal.” Gonzales v. Acadiana Fast Foods, Inc., 95-1011, pp. 6-7 (La.App. 3d Cir.1/31/96), 670 So.2d 457, 460, writ denied, 96-0554 (La.4/19/96), 671 So.2d 920. In fact, La. C.C.P. art. 1632, which provides for the order of trial, states that the order may be varied by the court when circumstances so justify. Furthermore, changing the order of proof is not equivalent to changing the burden of proof. The ruling makes it clear that the appellees met their burden of proof as the trial court stated that there were several points urged by Jones and Odom that the court considered and accepted as the basis for pleading the RICO violation.
| iaRice and Kendig additionally argue that the trial court rendered art. 863 meaningless by misconstruing subsection (B)(3), which states:
Each allegation or other factual assertion in the pleading has evidentiary support or, for a specifically identified allegation or factual assertion, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.
They contend that Jones and Odom could not claim they were likely to have evidentiary support after a reasonable opportunity for further investigation or discovery because they did not specifically identify such allegation or factual assertion, and because they elected not to conduct discovery before making the allegation.
This is incorrect. Jones and Odom alleged that they “believe” in paragraph 78 *42 and “believe and allege upon information and belief’ in paragraph 79 of their recon-ventional and third-party demand, before beginning paragraph 80 with “Specifically[.]” Moreover, as Taggart testified, they filed the claims relying on the conduct of discovery in a litigation proceeding when the availability of testimony under oath and all other safeguards would be applied in order to' determine' what the true facts were. Therefore, the trial court did not err considering whether assertions in the reconventional and third-party' demand were likely to have support after a reasonable opportunity for further investigation or discovery.
This assignment of error is without merit.
Assignment of Error Two: The trial judge erred, as a matter of law, in failing to apply the objective standard to determine whether or not Jones & Odom’s belief was formed after reasonable inquiry — at the time of pleading.
I’uRice and Kendig next contend that the trial judge erred in not applying the objective standard when determining if Jones’s and Odom’s belief was reasonable and formed after adequate inquiry at the time of the pleading. They argue that the trial judge adopted an entirely subjective standard.
Jones and Odom respond that the trial court indeed applied the objective standard. They point out that Rice and Ken-dig provided no support for this assertion that the court applied a subjective standard.
There is no indication in the trial court’s ruling that it applied a subjective standard when denying the motion for sanctions. The court did state, “[Allegations in pleadings may in all instances be the subject of reasonable discovery as long as there .is a genuine in belief in good faith.” As we noted earlier, subjective good faith does not satisfy the duty of reasonable inquiry. Nevertheless, the court never stated it was examining subjective good faith.
This assignment of error is also without merit.

Assignment of Error: Three: The trial judge eired, as a matter of law, in concluding that the July 24, 2009, Rice amended fee agreement was not disclosed or known to Jones & Odom prior to R & K’s August 27, 2010, response to a production request and that such surprise served as the basis for filing the civil RICO pleading.

Rice and Kendig contend that the trial court was clearly wrong in finding that Jones and Odom were unaware of the July 24, 2009, supplemental fee agreement until it was produced in discovery in August of 2010. They argue that Jones and Odom knew of the agreement no later than July 23, 2009, when it was referred to in the FDA.
hnOdom prepared the FDA, which stated in paragraph seven that the Skannals may elect to assign an additional percentage of the property recovered in the suit to Rice, and should they elect to do so, it will be in a separate instrument. Odom added this provision to the FDA because he wanted Rice to get something in writing if the Skannals gave him anything extra because Odom was working on new division orders and obtaining the mineral royalties. Rice had mentioned to Odom that the Skannals were going to give him a couple of extra points.
Jones and Odom contend that while the additional contingency fee agreement was contemplated in the FDA, it was not actually disclosed to them until August 27, 2010. On that date, Kendig responded to a request for production of documents .asking to produce all written agreements by *43 and between Rice and JBS, JBS as executor of the Succession, JBS as the trustee of the Trust, and/or ACS. Kendig provided the consultancy agreement and the July 24, 2009, additional contingency fee agreement.
The trial court obviously found Jones and Odom to be credible and specifically accepted their assertion that the additional contingency fee agreement was not revealed to them until August 27, 2010. We cannot conclude that the trial court was clearly wrong in this finding;

Assignment of Error Four: The trial judge erred as a matter of law in denying R & K’s motion for sanctions against J & O and their attorney David Taggart and further that he failed to award movers’ attorney fees and expenses and to award other such sanctions as were reasonable.

The Louisiana Racketeering Act (“RICO”) is found in La. R.S. 15:1351 et seq., with a civil remedy provided in La. R.S. 15:1356(E).
|1HLa. R.S. 15:1353 sets forth the prohibited activities under the Louisiana RICO Act:
A. It is unlawful for any person who has knowingly received any proceeds derived, directly or indirectly, from a pattern of racketeering activity to use or invest, whether directly or • indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in immovable property or in the establishment or operation of any enterprise.
B. It is unlawful for any person, through a pattern of racketeering activity, knowingly to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or immovable property.
C. It is unlawful for any person employed by, or associated with, any enterprise knowingly to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.
D. 'It is unlawful for any person to conspire or attempt to violate any of the provisions of Subsections A, B, or O of this Section.
The trial court stated that racketeering activity, an enterprise, and a pattern of racketeering activity must be present in a RIGO claim.
La. R.S. 15:1352[5] defines the terms found in the RICO Act:
A. As used in this Chapter, “racketeering activity” means committing, attempting to commit, conspiring to commit,.or soliciting, coercing, or intimidating another person to commit any crime that is punishable under the following provisions of Title 14 of the Louisiana Revised Statutes of 1950, the Uniform Controlled Dangerous Substances Law, or the Louisiana Securities Law:
[[Image here]]
(10) R.S. 14:67.(Theft)
[[Image here]]
(19) R.S. 51:712 (Unlawful practices regarding securities)
[[Image here]]
|17B. “Enterprise” means any individual, sole proprietorship, partnership, corporation or other legal entity, or any unchartered association, or group of individuals associated in fact and includes unlawful as well as lawful enterprises *44 and governmental as well as other entities.
C. “Pattern of racketeering activity” means engaging in at least two incidents of racketeering activity that have the same or similar intents, results, principals, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurs after August 21, 1992, and that the last of such incidents occurs within five years after a prior incident of racketeering activity.
Rice and Kendig argue that Jones and Odom failed to conduct a reasonable inquiry prior to filing their RICO claim. They first assert that the RICO pleading was not warranted by law because one of the two alleged predicate acts, violation of the Louisiana Securities Law[6] (La. R.S. 51:712), was not among the enumerated predicate acts at the time the conspiracy and enterprise were allegedly formed on March 12, 2005. It was added' in 2008.
We note that alleged unlawful practices involving securities, namely the failure to transfer to Jones and Odom the interests they obtained under the contingency fee agreement later struck down, took place after the statute was amended to include unlawful practices involving securities.
Rice and Kendig additionally argue that the RICO claim was factually baseless. They contend that the pleading was not well-grounded in fact since it claimed that Rice and Kendig took possession of many royalty payments by theft, yet there was no proof, much less an investigation, of that. They also contend there was a lack of support for the allegation of | ^securities fraud since Jones and Odom did not specify when the alleged sale of securities took place. Rice and Kendig note there had been no investigation or discovery of a factual basis for the pleading since it was filed. Therefore, there could be no reasonable belief that the allegations were well grounded in fact.
Jones and Odom contend that in order to induce them to continue to represent the Skannals in the lawsuit against the Bamburgs even after they were no longer being paid, representations were made to them that JBS was ready to transfer and assign to them their one-third contingency fee interests in the property recovered even though the actual intent was never to pay or assign anything to J & 0.
Odom testified that Rice and the Skan-nals encouraged him to continue working on the case between the time they stopped getting paid and when they were terminated. Jones added that he felt then and still felt that they were being set up when they were told not to bill and to continue working on the matter.
In order to better comprehend this issue, it is helpful to have a time line for what occurred in 2009 after the Skannals stopped paying Jones and Odom in August of 2008 because they lacked the funds to pay them:
May 15: Rice sent a letter to Odom in which he wrote that he was enclosing copies of checks along with bills that had been discussed in an earlier email. Rice wrote that he understood that the bills were past due and that Odom was worried about his credit with Odom’s experts. He added that he attempted to prod the Skannals into paying the bills as Odom had asked, but he believed the Skannals could not pay them.
*45 June 26: JBS emailed a reply to Odom concerning oil and gas remittances. He stated that Odom was entitled to one-third of the minerals and Sligo Hills. He also stated they wanted to continue with the case hsagainst Bamburg’s appeal, and he thought that as a co-owner Odom would want to keep the heat on the Bamburgs. JBS concluded by stating that after all the mineral royalties were accounted for, they could determine how they would finance future battles with the Bamburgs. He instructed Odom where to forward the royalty checks.
July 3: Odom emailed Rice that someone needed to talk to the Skannals to secure their agreement to pay their two-thirds of Dillon Murchin-son’s charges for title examinations as they accrued.
July 5: Odom provided Rice an email with some illustrations to give to the Skannals when he spoke with them about his fee and the difference between gross and net. He added that ACS was terribly wrong to think that the lawyers owed any part of the repayment obligation to the Bamburgs.
July 6: Odom received a letter in which Rice stated that if J & 0 chose to convert the fee to a contingency fee, then it would be based on one-third of what the clients recovered, before expenses. Rice also mentioned that the verdict of $2.7 million should be reduced by the amount owed to Bamburg, leaving a judgment of $2,160,000 plus interest. Rice warned that the Skannals may have the fee reviewed. He suggested that Odom file a rule if he believed he was entitled to the fee, and that Kendig would represent the Skannals in it. It turned out that Kendig had written this letter, and that Rice had signed it.
July 16: Jones and Odom each wrote checks to Rice to pay for their pro-rata share of expenses for title examinations. They gave the checks to Rice because they .believed they owned one-third of the mineral rights that were won in the lawsuit. Rice returned the checks to them marked “void” without explanation on September 29, 2009.
July 20: J & O filed suit on behalf of the Skannals against the Bamburgs seeking the removal of Dennis Bamburg as manager of Sligo Hills and nullification of an apparent option that JCS had purportedly granted to Bamburg to purchase the remaining one-half of Sligo Hills.
July 23: Odom received an email from a landman with Petrohawk concerning a proposed lease offer of $5,000 an acre, or about $2.94 million, for . the Skannal estate. Odom said he transmitted the offer to Rice and JBS, then had a conference with Rice and JBS about it. JBS wanted the lease bonus to be significantly higher.
July 23: The fee distribution agreement was executed.
Prior to July 24: Odom met with Rice and JBS about the need to execute new division orders that would divide the Skannal minerals two-thirds to the way that JBS wanted it, and one-third to Jones and _J_ssOdom. Odom said he would do a supplemental division *46 order to take care of Rice’s share of J & O’s one-third.
July 24: Rice and the Skannals executed the additional contingency fee agreement.
August . 25: J & 0 filed an appellate brief on behalf of the Skannals.
August 27: Odom obtained an ex parte court order allowing JBS as executor to pay the attorney fees owed under the FDA and to execute necessary acts of conveyance including division orders.
August 31: After receiving royalty payments, the Skannals paid $142,482[7] to J & 0 representing past-due invoices for hourly fees and expenses.
September 16: Odom received a phone call from the Skannals’ new counsel telling him that J & 0 had been terminated. The fee dispute and legal malpractice suit was filed two days later by Stone Pigman.
It was through a discovery response in the fee dispute lawsuit that Jones and Odom first learned of the additional contingency fee agreement that Rice had executed with the Skannals to give Rice an extra 3%.
Odom testified that they delayed filing any type of reconventional demand because they were trying to reach an agreement with the Skannals to escrow what they contended was their one-third interest. Jones and Odom signed an escrow agreement on August 27. On September 18, 2010, they learned that the Skannals would not sign the agreement. Odom considered this a delay tactic by the Skannals.
Odom contacted Taggart by January of 2011 and had a number of discussions with him about the reconventional demand. Odom prepared a time line memo for Tag-gart in which he detailed every step and the date of every step in the long saga of the lawsuit. The purpose of the memo was to show Taggart why they felt that Rice and Kendig had been steering the _j2jSkannals in the entire length of the litigation with the ultimate goal being to sue to nullify the fee agreement.
Odom estimated that he and Jones spent hundreds of hours in dozens of meetings with Taggart and his co-counsel, as well as sending countless emails and making phone calls, concerning the facts, law, and issues involved the reconventional and third-party demand. In preparation for the filing of the demand, Odom gave Tag-gart every document that was remotely relevant to fee agreements, fee disputes, royalty income, or anything that had to do with what Jones and Odom thought they were going to receive for handling Skan-nal v. Bamburg. Odom explained that this task was made difficult because they had already turned over all of the files to Stone Pigman.
The cost of services from Taggart’s firm relating only to the investigation and preparation for the reconventional demand was about $30,000.
Jones was hesitant about filing a claim against Rice because Rice was his first cousin. He said he investigated it as much as any case he has ever investigated before filing a pleading. Odom estimated that he probably spent 10 hours reviewing and editing drafts of the reconventional and third-party demand.
Taggart testified after that his firm was initially contacted around January 7, 2011, there was a very intense period for about a *47 month when they did their investigation before filing. He was under the impression that 12ahe needed to file the demand as quickly as he legally-could because of prescription concerns. . :
Taggart explained that he initiated both a factual and legal investigation as to what he and his clients believed were claims that could be asserted under the facts as they understood them at the time, and one of those claims turned out to be a state RICO claim.
Taggart also explained that the misappropriation that is among the predicate acts for the civil RICO claim ties back to all the times that the Skannals acknowledged to Odom that they were co-owners. These undivided interests had been part of the inducement for Jones and Odom to take the representation. of the Skannals initially, and certainly to keep it after the Skannals stopped paying them. Taggart believed that at the same time the Skan-nals offered to have the interests assigned and transferred, they were employing a scheme to defraud Jones and Odom of their interests.
Jones and Odom' believed that R & K played a role in this scheme. Without a doubt, the Skannals had a professional relationship with Rice. When granting Rice the additional contingency fee, they acknowledged that Rice had been their counsel since February of 2005. Rice was also involved in the negotiation of the original fee agreement. Rice made payments on behalf of the Skannals in May 2009 in conjunction with the prior litigation because they lacked money to pay for it. Rice advised the Skannals during the negotiation of the fee disbursement agreement. After the fee disbursement agreement-was in final form, the Skannals met privately with Rice before Rice told Jones that the Skannals were ready to sign it.
lasOdom recalled that Kendig called Jones to suggest that the assignments Of mineral rights from JCS to the Bamburgs could be attacked under what turned out to be’ an incorrect theory of law. Kendig also authored the July 6, 2009, letter to Odom that had been signed by Rice. Odom believed that the nullity of the fee agreement was originally the idea of Rice and Kendig based in large part on that July 2009 letter.[8] This letter followed several phone conversations and back and forth emails betwéen Odom and Rice over the computation of the fee. The wording of this letter indicated to Odom that Rice and Kendig were prepared, to sue them over the method of calculating the fee.
Jones and Odom noticed there was cooperation between the Skannals and Rice and Kendig after the Skannals sued them to nullify their contingency fee agreement. At court conferences or hearings, they would see Rice huddling with the Stone Pigman lawyers and .the Skannals. ■. Ken-dig was sometimes at the hearings and when he was there, he was talking with the Stone Pigman lawyers arid the Skannals.
The knowledge that Rice was to receive an additional 3% contingency fee was considered a watershed disclosure by Jones and Odom. Odom thought that Rice intended to conceal it because he knew that Odom was having discussions with oil companies about division and transfer orders, yet Rice never mentioned it to him. Jones recalled having discussions with Rice, .about how important it was to get accurate paperwork l^done for the division and trans *48 fer orders and payment of monies in suspense.
Jones stated that until the time of the lawsuit, he spoke to Rice several times a week, saw him weekly, and discussed their ongoing business relationship with the Skannals, yet Rice never mentioned the additional 3% fee. Jones also stated that between September 18, 2009, and August 26, 2010, Rice continued to acknowledge that his percentage fee would be the same as set in the consultancy agreement, and Rice felt he should be reimbursed once a cash distribution was made because he had advanced money to the Skannals for living expenses. Jones felt that Rice intentionally deceived him by concealing the additional 3% even after September 18,2009.
Odom thought it was amazing that Rice received the extra 3% fee at a time when nearly all of the work on the first lawsuit against the Bamburgs had already been done by J & O. The trial was over, the trial court’s opinions were written, and the final judgment was entered. The only thing really left to do of substance was to file the appellate brief with this court on the appeal that the Bamburgs had taken, which J & O did on August 25.
Rice maintained to Odom that the Skan-nals were going to give him a couple of extra points to compensate him for providing their living expenses. In contrast, Jones thought the additional 3% was Rice’s and Kendig’s way of ensuring they won regardless of whether them efforts to help the Skannals set aside the contingency fee agreement were successful or not.
1 gf;At trial, Jones recounted an earlier dealing with his cousin Rice that caused Jones to question his honesty. Jones explained that he is the sole member and president of Jones Energy Company, which was actively engaged in the oil and gas business in 2008. Jones Energy puts together lease blocks. A lease that he thought he had obtained was from Virginia Proby. One of his landmen said that Pro-by had accepted the terms and provisions of the lease, but she wanted independent counsel to look at it. A family member of Proby took her to the office of R & K to have the proposed lease reviewed. By the time that Proby left the office of R & K, the lease had been altered by whiting out Jones Energy as lessee and the heading which said “lease by and between Virginia Proby and Jones Energy Company,” and substituting Rice’s name and address in its place.
Jones testified that he learned of the change to the lease before August of 2010 when he tried putting together that lease block, and a landman told him they never obtained the Proby lease. When they checked the Caddo Parish website, they saw that the lease had been recorded by Rice. Jones guessed that Rice did not want him to know about it because Rice later sold the lease along with another one and made over $40,000. Jones said he confronted Rice about the lease shortly after learning about it, and that Rice expressed regret for doing it and offered to give him a medal that their grandfather had earned during World War I. Jones was shocked that Rice would do that to him because he had not been billing the Skannals for months at Rice’s request, while Rice told him that they would all catch up and make a return on them investment.
Rajones said the lease matter confirmed to him that Rice and Kendig would commit fraud upon him, so when he learned about the additional 3% fee, he knew that based upon greed and envy and Rice not wanting him to do well, just as he did with the lease, Rice had committed fraud again.
Marshall Rice testified as to the events surrounding the Proby lease. He stated that Proby’s son had contacted them look *49 ing for a better deal, as the amount that Rice was offering was better than the deal they had. Marshall Rice also stated that when they arrived at the office was the first time he learned that Jones Energy had made an offer. Proby asked to go forward with the Rice lease offer.
Odom testified that to understand why the facts and circumstances supported the claims against R & K, one should not look at the facts and circumstances in isolation, but as a whole. One of the factors to consider was that after the suit was tried, the Skannals realized they owned more than they originally thought and it was worth more than they originally thought.
For example, Odom testified that the mineral interests were not entirely specified in the mineral deed that was nullified because the deed simply stated that JCS was deeding all of his mineral interests and assigning the attached leases, which numbered around 20. At the time of trial, Jones and Odom were not actively investigating the entirety of what JCS owned because they were focusing on getting the deed nullified. Right before they went to trial, a landman came to their office to inform them that in addition to the acreage they knew of as the old Sligo plantation, JCS also owned a | ⅞720% mineral interest in about 750 acres slightly off the property of the old plantation.
The mineral rights were also very valuable. After the appeal was converted to a devolutive appeal, Odom worked on coordinating with over a dozen oil companies to obtain the money that had been held in suspense. As they got closer to the point when the funds that had been released amounted to three times what had been paid in hourly fees, Odom became concerned about how Jones and Odom were to receive their one-third since Skannal had said he did not want the funds deposited into a bank account.[9] Odom was also concerned that they were getting into a creditor situation with the Skannals, so he wanted a mechanism by which they would get their one-third of the royalties each month, which led to the drafting of the FDA.
According to our opinion in Skannal v. Jones Odom Dams & Politz, L.L.P., $1,139,136 was paid in royalties to the succession by August 18, 2009, and $1,108,480 was remitted to JBS on August 31,2009. On July 23, 2009, Odom received the email from the Petrohawk lease broker offering a bonus payment of $5,000 per acre for the 750 acres in which JCS had a 20% mineral interest.
Jones and Odom believed that the Skan-nals suddenly understood what they had won was worth a lot more than they had realized, and one-third of that going to Jones and Odom was going to hurt a lot more than it did at the start of the litigation.
ImWhile there was much focus on the efforts at discovery by Jones and Odom, in order to determine whether or not Jones, Odom, and Taggart made an objectively reasonable factual inquiry before filing the demand, one also must consider the knowledge that Jones and Odom developed during their representation of the Skannals, which dated back to 2005, as well as discovery conducted in the contingency fee nullification suit.[10] In fact, it was that discovery that revealed the additional con *50 tingency fee agreement between Rice and the Skannals.
Shortly after the' reconventional and third-party demand was filed, Jones and Odom sought the cell phone records of Rice, JBS, and ACS. However, by agreement with Marshall, Taggart withdrew their discovery requests when he dismissed the reconventional and third-party demand against the movers. Taggart testified that if, after discovery in the remaining claims against the Skannals, it was proven that Rice and Kendig were involved as they thought they were, then he would add them back to the reconventional demand.
Odom testified that he and Jones agreed to dismiss the claims against Rice and Kendig because they anticipated substantial discovery in the fee dispute lawsuit, and if they discovered any information that contradicted anything in the affidavits presented by Rice and Kendig, they would reinstate their demands.
| although Jones and Odom could not answer how much money they believed Rice had taken from them in royalties, it should be noted that paragraph 80 in the reconventional and third-party demand reads, with our emphasis: “In addition, the RICO defendants, or one or more of them, violated La. R.S. 14:67 by taking possession of the royalty paymentsf.]”
Based upon our review of the record, we cannot conclude that the trial court was clearly wrong in its factual findings serving as the basis for the denial of the motion for sanctions.[11]
CONCLUSION
At appellants’ costs, the judgment dismissing the motion for sanctions is AFFIRMED.
APPENDIX
TWENTY-SIXTH JUDICIAL DISTRICT COURT
BOSSIER PARISH
STATE OF LOUISIANA
JOHN BARRON SKANNAL, INDIVIDUALLY, AS TESTAMENTARY EXECUTOR OF THE SUCCESSION OF JOHN C. SKANNAL, AND AS TRUSTEE OF THE JOHN C. SKANNAL TRUST; AND A.C. SKANNAL, III VS. JONES, ODOM, DAVIS & POLITZ, L.L.P.
CIVIL DOCKET NO. 130,863-F
DIVISION: ASSIGNED AD HOC TO JUDGE E. JOSEPH BLEICH
FILED: DEPUTY CLERK OF COURT

RULING ON MOTION FOR SANCTIONS

Background, of Motion

|, This case and this Motion has stemmed from some most contentious litigation that has existed for several years. It is not necessary to provide a detailed history as both this court, the parties 'and the Hon. Second Circuit Court of Appeal are all familiar with such. Most of the primary issues of the litigation have been resolved.
Before the court is a Motion for Sanctions (hereinafter referenced as “Motion”). The Motion for Sanctions is filed by William F. Kendig and M. Carl Rice individually and in their firm name of “Rice and Kendig” (hereinafter all referred to indi *51 vidually and/or collectively as “Movers”). The styled ■ defendants named above, Jones, Odom, Davis and Politz, L.L.P. and the attorneys Jones and Odom are the respondents to the Motion'(hereinafter referenced as individually and/or collectively as “Respondents”).
The basis of the Motion is that the Movers were the victims of a scurrilous and baseless allegations in the Motion alleging potential violations of the “Louisiana Civil Racketeering Act,” La. R.S. 15:1351-1356 (hereinafter referred to as “RICO”). Movers urge a violation of La. C.C.P. art. 863 and provided testimony at the hearing as to what those sanctions should include.

\?The Pertinent Statutory Language

La. C.C.P. art. 863 provides in pertinent part:
[[Image here]]
B. ... the signature of an attorney or party shall constitute a certification by him that he has read the pleading, and that to the best of his knowledge, information, and belief formed after reasonable inquiry, he certifies all of the following:
(1) The pleading is not being presented for any improper purpose, such as to harass, cause ' unnecessary delay, or needlessly increase the cost of litigation.
(2) Each claim, defense, or other legal assertion in the pleading is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law.
(3) Each allegation or other factual assertion in the pleading has evidentiary support or, for a specifically identified allegation or factual assertion, is likely to have evidentiary support after a reasonable opportunity for farther investigation or discovery.
[[Image here]]
D. If, upon motion of any party or upon its own motion, the court determines that a certification, has been made in violation of the provisions of this Article, the court shall impose upon the person who made the certification or the represented party, or both, an appropriate sanction which may include an order to pay to the other party the amount of the reasonable . expenses incurred because of the filing of the pleading, including reasonable attorney fees.
E. A sanction authorized in Paragraph D shall be imposed only after a hearing at which any party or his counsel may present any evidence or argument relevant to the issue of imposition of the sanction.
F. A sanction authorized in Paragraph D shall not be imposed with respect to an original petition which is filed within sixty days of an applicable prescriptive date and then voluntarily dismissed within ninety days after its filing or on the elate of a hearing on the pleading, whichever is earlier.
,G. If the court imposes a sanction, it shall describe the conduct determined to constitute a violation of the provisions of this Article and explain the basis for the sanction imposed. [Emphasis supplied; some language omitted.]
As the basis for the Motion, Movers urge in general that there was no basis for a logical extension of the law which would likely gain evidentiary support after a rea--sonable opportunity for further investigation or discovery. The court is required to examine pertinent portions of the RICO statute.
La. R.S. 15:1351-1356 state in pertinent part:
§ 1352. Definitions
A. ..., “racketeering activity” means committing, attempting to commit, conspiring to commit, or soliciting, *52 coercing, or intimidating another person to commit any crime that is punishable [3under the following provisions of Title 14 of the Louisiana Revised Statutes of 1950, the Uniform Controlled Dangerous Substances Law, or the Louisiana Securities Law:
[[Image here]]
(10) R.S. 14:67 (Theft)
[[Image here]]
(17) R.S. 14:230 (Money laundering)
[[Image here]]
(19) R.S. 51:712 (Unlawful practices regarding securities)
[[Image here]]
(38) R.S. 14:133 (Failing or maintaining false public records)
[[Image here]]
B. “Enterprise” means any individual, sole proprietorship, partnership, corporation or other legal entity, or any un-chartered association, or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities.
C. “Pattern of racketeering activity” means engaging in at least two incidents of racketeering activity that have the same or similar intents, results, principals, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurs after August 21, 1992, and that the last of such incidents occurs within five years after a prior incident of racketeering activity. [Emphasis supplied; some language omitted.]
The court also notes that a person may “commit” a crime in connection with the language contained in La. R.S. 14:24:
“Principals. All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.”
The court must examine if the following points are met in connection with an examination of the cited statutes:
Was there a basis in Respondents’ pleadings containing a “nonfrivolous argument for the extension, modification” of law that would “likely have evidentiary support after a reasonable opportunity for further investigation or discovery?” The parts of RICO to consider are these as the terms are defined:
1. “Racketeering activity”;
2. “Enterprise”; and,
3. “Pattern of racketeering activity.”
All three must be present
| ¿Discussion
Important to this court in this analysis is the inference that may be drawn from the language “likely to have evidentiary support.” This court concludes that this language clearly implies that there may be an allegation without extant evidence at the time the allegation is made. Obviously if there is evidence already procured the argument against an alleged sanctionable pleading is borderline frivolous in itself.
The court does not conclude that an attorney or party can make imaginary, baseless or emotional statements in pleadings. Yet that does not mean that the pleading attorney must have concrete evidence in hand before making allegations. Allegations in pleadings may in all instances be the subject of reasonable discovery as long as there is a genuine belief in good faith that evidence will likely be developed during discovery assuming it does not al *53 ready exist Before this court could impose sanctions, it is noted that La. C.C.P. art. 863 is intended for exceptional circumstances and is to be strictly construed.[1]
Portions of this analysis are fairly simple to address in connection with allegations “likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.”
It would be simple to prove an “enterprise” as that may theoretically involve only one person. Just two incidents involving the “same or similar intents” are necessary to prove a RICO “pattern.”
The more difficult part of this analysis is examining the then existing facts [2] which led to Respondents’ filing the pleading[3] of a RICO violation. It is noteworthy in La. C.C.P. art. 863 that the pleading party does not have to suggest that what is written complies with settled law. The attorney making the pleading could and can be seeking an extension of the law, or stated differently, the attorney may be seeking to “plow new ground.” The law is not and has never been stagnant.
There were a number of points urged in hearing and brief by Respondents that the court | ¡¡has considered and accepted as forming the basis for the pleading of a RICO violation:
1. Counsel for Respondents, Mr. Tag-gart, spent a great deal of time, approximately 267 hours, prior to making any RICO allegation.
2. One of the Respondents was making this filing against a relative which caused him to be extremely concerned and cautious.
3. Counsel for Respondents consulted with another law firm during his investigation and had multiple discussions concerning a possible RICO case with Respondents before filing any pleading.
4. Due to the success of Respondents in prior related litigation, Respondents strongly suspected their then clients to have a motive to reduce their fees and/or causing them a degree of financial loss.
5. Existing, rivalry between Movers and Respondents was patently clear for a number of years as to who was going to represent the Skannals. This created concern for Respondents as to the actions of Movers including seeking some type of fee arrangement from the Skannals, although the work in the prior litigation was actually performed by Respondents.
6. One of the Respondents testified that he had been actually and financially deceived by one of Movers on a previous occasion, including the alteration of documents (a mineral lease) which was not disclosed to Respondents. It was testified to by Respondents that Movers conceded this and stated that he “regretted” what he had done; this testimony was not refuted. This caused Respondents to reasonably conclude that chicanery very well might occur again.
*54 7. An “additional” fee agreement between the Skannals and Movers was never revealed to Respondents by movers.
The court does not isolate its focus on any isolated one of the above factual situations being the conclusions of the court. The court must and does look in toto as all being interrelated bases for the filing of the RICO action.
Based on the above, the court finding that the Motion is without merit, the Motion for Sanctions is hereby DISMISSED.
Costs of all proceedings in connection with the Motion are taxed against Movers.
| fiThe Clerk of Court is ordered to forward a certified copy hereof to all counsel of record.
Formal judgment herein shall be prepared and submitted to the court.[4]
THUS DONE AND SIGNED in Ru-ston, Louisiana, this 16 day of February, 2015.
/s/ E. Joseph Bleich
District Judge Ad Hoc
26th Judicial District Court

. La. R.S. 15:1353(B) and (C).

. Jones, Odom, Davis & Politz, L.L.P., was the name of the firm at that time.

. Elizabeth Skannal signed it on August 20, 2009.

. Stone Pigman Walther Wittman, L.L.C.

. The reference to "Louisiana Securities Law” and La. R.S. 51:712 was added to.La. R.S. 15:1352 by Act 149 of 2008.

. A fractional undivided interest in oil, gas, or other mineral rights is included within the definition of "security.” La. R.S. 51:702(15)(a).

. J & O contended that $55,594 remained unpaid.

. Rice’s son John Marshall Rice testified that he never heard a conversation in the office between Rice and Kendig; or Rice and/or Kendig and the Skannals about Stone Pigman or a reference to Stone Pigman, and he never heard Rice or Kendig ever suggest to the Skannals that they should contest the contingency fee.

. JBS had wanted each check sent to a Federal Express office in Austin, Texas.

. Nevertheless, Jones and Odom believed that discovery was delayed in that suit for more than a year while they were in negotiations with the Skannals to put one-third of the royalties in escrow.

, Accordingly, it is unnecessary for this court to address the fifth assignment of error which concerned the taxing of costs.

. Caldwell v. Griggs, 924 So.2d 464 (La.App. 2nd Cir.-2006).

. This court finds it totally irrelevant that which was stated in brief concerning the disciplinary measures as to one counsel. That is not considered in the slightest degree.

.It is most noteworthy that Respondents were being more than discreet and cautious so as not to embarrass Movers in that the pleadings were sealed from the beginning.

. Rules for Louisiana District Courts and Juvenile Courts and Numbering System for Louisiana Family Court Proceedings, § II, Rule 9.5.